JANE TOLL y la SUCESIÓN DE DON MACARIO RIVERA ROJAS, ETC., demandantes y recurridos, *v.* FELICIANO ADORNO MEDINA, su esposa, ELADIA MEDINA PASTRANA, ETC., demandados y peticionarios.

Número: CE-89-529          Resuelto: 29 de abril de 1992

*José A. Fernández Paoli* y *José Ramón Quiñones Coll*, abogados de los peticionarios; *Sabino Cotto Cruz*, abogado de los recurridos.

PER CURIAM:

## I

El 10 de abril de 1968 los esposos Macario Rivera y Jane Toll arrendaron a Feliciano Adorno Medina (t/c/p Chiquitín Adorno) por diez (10) años —prorrogable a quince (15) más— un inmueble situado en Bayamón. Pactaron, además, un derecho de opción de compra susceptible de ejercitarse en cualquier momento durante el transcurso del convenio. Los arrendadores Rivera-Toll se reservaron el derecho de resolver el contrato por incumplimiento de cualesquiera de sus cláusulas.

Así las cosas, el 10 de septiembre de 1986 la Policía llevó a cabo un allanamiento en el Club Monte Casino, local objeto del contrato operado por Adorno Medina. Se ocupó material presuntamente utilizado para la operación de una banca ilegal de bolita. Presentadas las demandas correspondientes, el material incautado fue suprimido en vista preliminar por haberse obtenido en contravención a la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1.

Al conocer el allanamiento ocurrido el 10 de septiembre de 1986, los esposos Rivera-Toll notificaron a Adorno Me-

dina que se proponían resolver el contrato de arrendamiento. Ante esta situación, Adorno Medina les comunicó que estaba ejercitando la opción a compra.

El 4 de noviembre de 1986, Jane Toll *et als.* presentaron en el Tribunal Superior, Sala de Bayamón, una acción civil sobre resolución de contrato, desahucio y daños y perjuicios. Antes de ser emplazado, Adorno Medina presentó en el mismo tribunal una acción en la que solicitaba el cumplimiento específico del contrato. Ambas fueron consolidadas.

Mediante el uso de mecanismos de descubrimiento de prueba, Adorno Medina tuvo conocimiento de que Jane Toll *et als.* pretendían sostener sus alegaciones utilizando la evidencia testifical y documental suprimida en el caso criminal.[1] Pidió que se decretara su inadmisibilidad.

Oportunamente la ilustrada sala de instancia (Hon. Zulma Zayas Puig, Juez), en una extensa y fundamentada resolución, resolvió que era admisible. Inconforme, a solicitud de Adorno Medina, revisamos.

## II

El Art. II, Sec. 10 de nuestra Constitución, *supra*, específicamente declara que la evidencia obtenida en violación de la Sec. 10, Art. II de la Constitución del Estado Libre Asociado, *supra, no será admisible en los tribunales.* Los contornos de esta prohibición han sido frecuentemente expuestos en el área de lo criminal. Este recurso nos permite examinarlos en un pleito de naturaleza civil entre partes privadas, en el cual el Estado no tiene ninguna injerencia. La tarea requiere acudir, someramente, a sus orígenes y fundamentos.

---

[1] Consistente del testimonio de varios agentes del orden público, quienes declararían sobre el arresto de Adorno Medina y el allanamiento; testimonio de César Silva (fotógrafo del periódico *El Mundo*) y de los materiales incautados.

El legajo constitucional es muy escaso. Durante la Convención Constituyente se presentó un total de seis (6) proposiciones que disponían la inadmisibilidad de la evidencia obtenida en violación de alguna sección de la Constitución. De éstas, las Proposiciones Núms. 20 (posteriormente sustituida por la Proposición Núm. 94), 63, 272 y 295 atendían la exclusión de evidencia obtenida mediante registros y/o allanamientos ilegales. Las Núms. 20 y 94 ordenaban la exclusión en *procedimientos criminales*; las demás no eran tan específicas.

El Informe de la Comisión de Carta de Derechos la caracterizó como propósito "dar garantía adicional y efectiva a estos derechos [los contenidos en la Sec. 10]". 4 Diario de Sesiones de la Convención Constituyente 2568 (1952). Por su parte, durante su debate y discusión el Presidente de esa Comisión, Sr. Jaime Benítez, describió la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra*, como "el texto que existe en la declaración de derechos de la Constitución federal. Es la que *existe entre nosotros* y es la que *ha sido interpretada y es conocida* ...". (Énfasis suplido.) Diario de Sesiones, *supra*, T. 3, pág. 1567.

Las referencias durante los incidentes de la Convención Constituyente tienden a demostrar que su inclusión en el documento pretendía cristalizar el estado de derecho vigente en 1952. Así lo recomendó la Escuela de Administración Pública. *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública de la Facultad de Ciencias Sociales, Eds. Universidad de Puerto Rico, 1952, pág. 162; J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. Universidad de Puerto Rico, 1982, Vol. III, pág. 192.

Expongamos, pues, sus *antecedentes*. A comienzos de siglo imperaba en Puerto Rico el principio del *common law* de que la admisibilidad de la prueba no quedaba afectada por haber sido obtenida ilegalmente. Su alcance y extensión fueron señalados en *El Pueblo v. Cerecedo*, 21 D.P.R.

56 (1914). Guiados exclusivamente por precedentes norte-americanos, dijimos:

> "Si la orden de allanamiento fué ilegal, o si el funcionario que la cumplimentó se excedió en sus atribuciones, la persona a petición de la cual fué librada dicha orden, o el funcionario sería responsable del perjuicio causado. Pero esta no es una buena razón para que sean excluídos como prueba los documentos ocupados si ellos eran pertinentes al caso, como indiscutiblemente lo fueron. En la presentación de documentos como prueba la corte no puede tomar en consideración la forma en que se obtuvieron, o sea, si fueron adquiridos legal o ilegalmente, ni constituyen ellos una alegación de carácter independiente del punto en discusión en la que pueda fundarse la resolución de dicha cuestión.
>
> "...'El principio fundamental es claramente que cuando la corte está celebrando un juicio criminal, no tomará en consideración la forma en que los testigos han obtenido los documentos u otros objetos de uso personal, que son esenciales y que han sido debidamente ofrecidos como prueba.' " (Citas omitidas.) *Pueblo v. Cerecedo*, supra, pág. 62.

Esta orientación varió en *Pueblo v. Capriles*, 58 D.P.R. 548 (1941). Al discutir la aplicabilidad de la regla imperante en California, expusimos así el fundamento *estrictamente disuasivo* que motivó el cambio doctrinal:

> Volviendo ahora a la regla de California antes aludida, opinamos que la consecuencia lógica de dicha regla al permitir que evidencia ilegalmente obtenida sea en todo caso admisible como prueba, *ofrece un incentivo a funcionarios poco escrupulosos para pasar sobre el precepto constitucional cada vez que deseen conseguir evidencia incriminatoria contra una persona o lograr su convicción de un delito mediante evidencia así obtenida.* En cambio, rechazando esa prueba, *no sólo se reprimen esos abusos*, si que la propia resolución de la corte al rechazarla constituye *la mejor reprobación de la conducta ilegal del funcionario.* (Énfasis suplido.) *Pueblo v. Capriles*, supra, pág. 554.

Posteriormente extendimos la doctrina de *Pueblo v. Capriles*, supra, a registros ilegales. Véanse: *Pueblo v. Ro-*

sado, 62 D.P.R. 197, 199 (1943); *Pueblo v. Decós*, 62 D.P.R. 148 (1943).[2]

■ Vemos, pues, que el único propósito de la regla de exclusión, según incorporada a esta jurisdicción *antes* de la Constitución, era evitar que *funcionarios gubernamentales* se beneficiaran de actuaciones claramente ilegales. Teóricamente, con la prohibición cesaba el atractivo que motivó al Gobierno a obtener dicha evidencia, esto es, su recopilación para adelantar *sus intereses* en una acción legal, fuera de naturaleza *criminal o civil.*

### III

■ Con posterioridad a nuestra Constitución, en su etapa madura, podemos decir que la regla de exclusión encarna tres (3) propósitos ínsitos en el Art. II, Sec. 10, *supra.* Primero, disuadir y desalentar a los funcionarios del orden público de que violen la protección constitucional (*deterrence*). Se reconoce que este elemento disuasivo realmente es el más fundamental. Segundo, integridad judicial. Los tribunales no deben ser cómplices de actos de desobediencia a la Constitución y admitir evidencia ilegalmente obtenida. Y tercero, impedir que el Gobierno se be-

---

[2] Antes de la aprobación de nuestra Constitución, numerosos casos sostuvieron la inadmisibilidad de la evidencia ilegalmente obtenida. *Pueblo v. Decós*, 62 D.P.R. 148 (1943); *Pueblo v. Rosado*, 62 D.P.R. 197 (1943); *Pueblo v. Nieves*, 67 D.P.R. 305 (1947); *Pueblo v. Capriles*, 58 D.P.R. 548 (1941).

Luego de su vigencia, véanse: *Pueblo v. Ortiz Zayas*, 122 D.P.R. 567 (1988); *Pueblo v. García Colón*, 122 D.P.R. 334 (1988); *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988); *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988); *Pueblo v. Bonilla Rivera*, 119 D.P.R. 750 (1987); *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986); *Pueblo v. Martínez Martí*, 115 D.P.R. 832 (1984); *Pueblo v. Conde Pratts*, 115 D.P.R. 307 (1984); *Pueblo v. Hernández Flores*, 113 D.P.R. 511 (1982); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982); *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980); *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977); *Pueblo v. Soto Zaragoza*, 99 D.P.R. 762 (1971); *Pueblo v. Tribunal Superior*, 97 D.P.R. 517 (1969); *Pueblo v. Bonet Flores*, 96 D.P.R. 685 (1968); *Pueblo v. De Jesús Robles*, 92 D.P.R. 345 (1965); *Pueblo v. Cruz Martínez*, 92 D.P.R. 747 (1965); *Pueblo v. Sosa Díaz*, 90 D.P.R. 622 (1964); *Pueblo v. Franchi*, 78 D.P.R. 308 (1955).

neficie de sus propios actos ilícitos; de otra manera la ciudadanía perdería confianza en el Gobierno. 1 *La Fave and Israel, Criminal Procedure* Sec. 3.1(b), pág. 135 (1984).

■ Se acepta, pues, que esta regla de exclusión está fundamentada en razones de interés público para hacer valer la garantía contra registros, detenciones o incautaciones irrazonables. La exclusión nada tiene que ver con su valor probatorio, confiabilidad ni con la búsqueda de la verdad.

> Como reconocimiento a la libertad esencial que debe gozar todo ciudadano, la cláusula constitucional está orientada a proteger a la persona, pertenencias e intimidad del hogar o propiedad frente al abuso de poder por parte del Estado. Se trata, específicamente, de proteger la intimidad de las personas, así como la inviolabilidad del domicilio o propiedad (e.g., automóvil, papeles, libros, etc.), frente a cualquier irrazonabilidad del Estado al utilizar su autoridad limitada por ley para realizar registros y allanamientos. D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989, pág. 61.

■ Y es que, por definición, una regla de exclusión de evidencia tiene el efecto de eliminar evidencia pertinente a una controversia o a la credibilidad de un testigo.[3] Dicha norma puede estar predicada en la falta de confiabilidad de la evidencia, en el escaso valor probatorio o *en consideraciones de interés público ("policy") ajenas al fin último de las reglas: la búsqueda de la verdad.*

■ Aunque el texto de nuestra Constitución proyecta de su faz una prohibición absoluta —más allá de la esfera penal o actuación gubernamental— nada impide que en las causas civiles los tribunales tomemos en cuenta sus propósitos y beneficios, y calibremos los costos sociales positivos

---

[3] Para ser admisible una prueba en evidencia, ésta ha de referirse a una cuestión en controversia o a la credibilidad de algún testigo o declarante. Regla 18 de Evidencia, 32 L.P.R.A. Ap. IV.

y negativos que la Constitución representa para una eficaz administración de la justicia.(⁴)

■ Así, en *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984), resolvimos que "la garantía contenida en la Sec. 10 del Art. II de la Constitución de Puerto Rico cubre tanto los registros *administrativos* como los penales" (énfasis suplido); claro está, este pronunciamiento tomó como trasfondo los registros administrativos *gubernamentales.*

■ Contestar tajantemente la interrogante sobre la aplicación de la regla de exclusión a los procesos civiles no es fácil. No obstante, como premisa elemental se acepta que la distinción tiene que ser si el Gobierno es o no una parte en el caso, o de alguna manera se beneficia con la admisión de la evidencia ilegalmente obtenida. Véase B.J. George, *Constitutional Limitations on Evidence in Criminal Cases*, New York City, Practising Law Institute, 1969, pág. 112.

■ Bajo este predicado, no albergamos dudas de que, como mínimo, la regla de exclusión aplica por mandato constitucional en las siguientes instancias de litigación civil: cuando el Gobierno es parte en el caso y la evidencia ha sido obtenida mediante registro e incautación ilegal atribuible a un funcionario o agente gubernamental; si fue obtenida por una persona particular en confabulación con un funcionario o agente gubernamental; si fue obtenida mediante violencia o brutalidad, o si constituyó una intromisión a la zona de intimidad constitucionalmente protegida.

---

(⁴) En la jurisdicción federal, incluso en lo criminal, la tendencia ha sido flexibilizar su rigorismo. Véase *United States v. Calandra*, 414 U.S. 338 (1974). Como excepción, se ha permitido el uso de evidencia obtenida ilegalmente por el Ministerio Fiscal para impugnar las declaraciones de un acusado en su examen directo, *Walder v. United States*, 347 U.S. 62 (1954), y las hechas durante el contrainterrogatorio del Ministerio Público, *United States v. Havens*, 446 U.S. 620 (1980).

En *United States v. Leon*, 468 U.S. 897 (1984), bajo la doctrina del registro de buena fe (*good faith*), se permitió, como prueba sustantiva, la evidencia obtenida por funcionarios gubernamentales, a pesar de que posteriormente se determinó que la orden había sido expedida sin causa probable.

H.W. Baade, *Illegally Obtained Evidence in Criminal and Civil Cases: A Comparative Study of a Classic Mismatch II*, 52 Tex. L. Rev. 621, 700 (1974).

Estos horizontes no son totalmente extraños. Ya en *Pueblo v. Rovira Ramos*, 116 D.P.R. 945, 952 (1986) —opinión concurrente del Juez Asociado Señor Irizarry Yunqué, a la cual se unieron los Jueces Asociados Señores Negrón García y Ortiz— se dijo que la garantía constitucional era una "prohibición contra el Gobierno; *nunca se da contra personas privadas*. En *Burdeu v. McDowell*, 256 U.S. 465 (1921), se resolvió que el término Gobierno debe ser utilizado en su sentido amplio, que incluye a todos los agentes gubernamentales y no sólo a los oficiales encargados de poner en vigor las leyes". Más adelante dichos magistrados hicieron la salvedad de que "puede invocarse contra *personas privadas* que realizan registros con el propósito específico de obtener pruebas incriminatorias y así presentar una acusación formal en su contra ante los tribunales". Íd., pág. 952 esc. 2. Véase, además, *Pueblo v. Ramírez Lebrón*, 123 D.P.R. 391 (1989).([5])

■ La exposición anterior nos permite concluir que la cláusula constitucional contra registros, allanamientos e incautaciones, así como la regla de exclusión de la evidencia ilegalmente obtenida, opera principalmente contra el Estado. Esa protección no se limita a casos criminales: *aplica a todo pleito judicial en que el Gobierno sea parte.*

## IV

Con esta perspectiva en mente, examinemos la admisibilidad en el caso de autos, esto es, en un pleito civil —entre personas privadas— de evidencia obtenida por la ini-

---

([5]) Opinión *concurrente* del Juez Asociado Señor Negrón García, a la cual se unió el Juez Asociado Señor Rebollo López.

ciativa propia de la Policía de Puerto Rico en violación a la protección constitucional.

Según señaláramos, su propósito es *disuadir* toda conducta de los agentes del Gobierno que infrinjan la Constitución o la ley. La solución adoptada por nuestra Constitución para prevenir dicha conducta es la más *drástica*: *inadmisibilidad*. Ello responde a la visión de que en la relación *gobierno-ciudadano*, los intereses y objetivos sociales implicados justifican la adopción de un remedio tan extraordinario en todo caso en que el Gobierno pretenda utilizar dicha evidencia contra quien se le han violado sus derechos constitucionales.

■ Ahora bien, la situación es distinta frente a partes privadas *ajenas* a ese *modus operandi*. Sostener automáticamente su inadmisibilidad menoscabaría, en cierta forma, el fin de todo derecho evidenciario: *la búsqueda de la verdad*. No podemos olvidar que la regla de exclusión reclama un balance entre el efecto disuasivo y el logro de la verdad. Resolvemos, como norma general, *que en un pleito civil entre partes privadas* —en ausencia de sugerencia, instigación, requerimiento o instancia, esto es, común acuerdo con un agente del orden público o un funcionario encargado de velar por el cumplimiento de la ley— no aplica la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra*. Aun cuando en el ordenamiento penal pueda producir confianza ciudadana y fomentar el acatamiento de las leyes por los funcionarios gubernamentales, empero, su extensión al ámbito de la litigación civil, y como consecuencia la frustración en la concesión de remedios judiciales, puede generar pérdida de confianza en la habilidad de los tribunales en mantener un sistema adecuado para resolver disputas entre partes privadas.[6]

_____

[6] Decretar esa inadmisibilidad puede producir resultados injustos e inadecuados en pleitos civiles entre litigantes privados. La vida real es mucho más rica que la

Como dijéramos antes, enfatizamos que "la regla de exclusión aplica por mandato constitucional en las siguientes instancias de litigación civil: cuando el Gobierno es parte en el caso y la evidencia ha sido obtenida mediante registro e incautación ilegal atribuible a un funcionario o agente gubernamental; si fue obtenida por una persona particular en confabulación con un funcionario o agente gubernamental; si fue obtenida mediante violencia o brutalidad, o si constituyó una intromisión a la zona de intimidad constitucionalmente protegida".

## V

Lo expuesto derrota el reclamo de Adorno Medina. Se trata de un pleito civil entre partes privadas. *No está presente el elemento disuasivo.* Tampoco se ha demostrado que los proponentes de la evidencia, Jane Toll *et als.* hayan actuado o participado en común acuerdo con los agentes de la Policía o concurran algunas de las otras circunstancias apuntadas.

Esta interpretación supera resultados absurdos y fuera de toda lógica adjudicativa. "El sentido común muchas veces es una apreciación sintética, en cánones de justicia natural, de la misma naturaleza de las cosas, de la realidad vital. La interpretación que repugne a ese sentido común ha de ponernos en guardia contra ella. Generalmente será una mala aplicación del Derecho, probablemente una aplicación debida a un método equivocado." J. Vallet de Goyti-

---

imaginación judicial. Pero, a modo de ejemplo, tomamos un pleito de custodia entre los progenitores de un menor. Una de las partes pretende presentar evidencia demostrativa de abuso sexual por parte del padre. Se trata de evidencia obtenida por agentes del Gobierno mediante un registro ilegal inadmisible en un pleito criminal. Ciertamente esa evidencia en el pleito civil sería de cardinal importancia y, sin duda, ayudaría al tribunal a adoptar una determinación más informada, acercándolo al ideal de desentrañar la verdad como axioma inmerso en toda adjudicación judicial.

solo, *Panorama del Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1973, pág. 86.[7]

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Hernández Denton.

¿Es admisible en evidencia, *en un pleito civil entre dos partes privadas*, prueba referente a un material delictivo *ocupado por agentes de la Policía de Puerto Rico*, material en relación con el cual existe *un dictamen judicial final y firme*, emitido en un proceso criminal, a los efectos de que dicho material fue ocupado *en violación* de las disposiciones de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1?

Al resolver la referida interrogante en la afirmativa mediante la opinión emitida en el presente caso, una mayoría de los integrantes del Tribunal reescribe, a su forma y manera, la citada Sec. 10 del Art. II de nuestra Constitución en perjuicio de los derechos que expresamente le quiso garantizar la Asamblea Constituyente a los ciudadanos de este País al adoptar la citada disposición constitucional.

---

[7] *Pueblo v. Santiago Colón*, 125 D.P.R. 442 (1990), opinión concurrente del Juez Asociado Señor Negrón García, a la cual se unió el Juez Asociado Señor Ortiz.

# I

La situación fáctica del presente caso resulta ser extremadamente sencilla. Los demandantes recurridos, dueños de una propiedad inmueble comercial localizada en la ciudad de Bayamón, Puerto Rico, le arrendaron la misma —con derecho a opción de compra— a los demandados peticionarios. Estando vigente el referido contrato de arrendamiento, la Policía de Puerto Rico allanó el local comercial en controversia en cumplimiento de una orden a esos efectos expedida por magistrado competente. En dicho allanamiento la Policía ocupó material delictivo relacionado con el juego ilegal de la bolita. En relación con el material ocupado, el Estado intentó procesar criminalmente al codemandado peticionario Feliciano Adorno Medina por una infracción a la Ley de Bolita de Puerto Rico, pero, el tribunal ante el cual se radicó dicha denuncia determinó inexistencia de causa probable, basado dicho dictamen en la ilegalidad de la ocupación del mencionado material delictivo. Dicha actuación judicial no fue revisada por el Estado.

Así las cosas, los arrendadores recurridos instaron contra los arrendatarios peticionarios una acción sobre resolución de contrato, desahucio y daños y perjuicios ante el Tribunal Superior de Puerto Rico, Sala de Bayamón. Basaron la acción radicada en las disposiciones de una de las cláusulas del contrato celebrado entre las partes.(¹) Los peticionarios, por su parte, radicaron ante el mismo foro judicial una demanda mediante la cual solicitaron del tribunal que ordenara a los arrendadores recurridos a cumplir

---

(¹) La cláusula K del contrato otorgado establece:

"Queda expresamente convenido y pactado por las partes comparecientes que el negocio objeto de este contrato podrá ser utilizado para restaurant, expendio de bebidas alcohólicas, baile, fiestas privadas, panadería, repostería, expendio de comidas a domicilio y cualquier fase del negocio germano o incidental a estos ya mencionados, siempre que cumpla con los (sic) previsto por la Ley, las ordenanzas municipales, el uso y las buenas costumbres." Petición, pág. 3.

con la opción de compra que habían otorgado respecto a la propiedad en controversia. Ambas acciones fueron consolidadas.

Anunciada por los arrendadores, en la etapa de descubrimiento de prueba, su intención de utilizar, como evidencia en apoyo de su contención, tanto el material delictivo como el testimonio de los agentes de la Policía de Puerto Rico que ocuparon el mismo, los demandados peticionarios requirieron del tribunal de instancia que pasara juicio sobre la admisibilidad, *en la esfera civil*, de la referida prueba. Dicho foro judicial resolvió que dicha evidencia era admisible en el pleito civil.

Inconformes, los demandados acudieron —vía *certiorari*— ante este Tribunal en revisión de dicha determinación. En el recurso que a esos efectos radicaran, le imputaron al foro de instancia haber errado al:

> A. ... resolver la controversia sobre la admisibilidad en el caso civil de la evidencia suprimida en la acción criminal, a la luz de decisiones jurisprudenciales interpretativas de la Constitución Federal de los Estados Unidos, ignorando así la clara y expresa prohibición de la Constitución del Estado Libre Asociado de Puerto Rico a esos efectos.
>
> B. ... resolver, que bajo las disposiciones de la Constitución del Estado Libre Asociado de Puerto Rico, una evidencia obtenida por agentes del orden público como consecuencia de un allanamiento irrazonable e ilegal y que ya fue objeto de supresión en un proceso criminal, es admisible en un caso de naturaleza civil. Petición, pág. 9.

Expedimos el auto de *certiorari* solicitado. Hoy, mediante la opinión mayoritaria que emite el Tribunal, se confirma la resolución recurrida. Diferimos; *veamos por qué.*

## II

La opinión mayoritaria emitida resuelve que "como norma general ... en un *pleito civil* entre partes privadas

—en ausencia de sugerencia, instigación, requerimiento o instancia, esto es, común acuerdo con un agente del orden público o un funcionario encargado de velar por el cumplimiento de la ley— *no aplica la Sec. 10 del Art. II de la Constitución ...*". (Énfasis en el original suprimido y énfasis suplido.) Opinión mayoritaria, pág. 362.

Como surge de una somera lectura de la ponencia suscrita y endosada por una mayoría de los integrantes del Tribunal, la misma se apoya, de manera principal, en jurisprudencia interpretativa de la Cuarta Enmienda de la Constitución de los Estados Unidos, L.P.R.A., Tomo 1, y, en adición, en escritos de distintos, y distinguidos, comentaristas norteamericanos cuyas obras, naturalmente, giran en torno a la doctrina vigente en la jurisdicción federal.

Esto es, el Tribunal en el presente caso incurre en el error de resolver este tipo de situación a base de la doctrina prevaleciente en la esfera federal, la cual es una no sólo mucho más restrictiva y conservadora que la norma imperante en nuestra jurisdicción, sino que, naturalmente, una basada en las disposiciones específicas de la citada Cuarta Enmienda de la Constitución federal.

A esos efectos, no debe perderse de vista, *en primer lugar*, que en la jurisdicción federal la llamada "regla de exclusión" no goza, por sí misma, de rango constitucional sino que la misma es meramente una medida profiláctica de los derechos bajo la referida Cuarta Enmienda de la Constitución federal. En consecuencia, en esa jurisdicción la referida "regla de exclusión" está sujeta a *modificación e, inclusive, hasta puede ser abolida.* Véase *Illinois v. Gates*, 462 U.S. 213, 223 (1983).

En *segundo término*, merece destacarse el hecho de que la citada Cuarta Enmienda de la Constitución federal "describe el ámbito mínimo de la garantía que reconoce. Los estados no pueden achicar esas fronteras, pero pueden expandirlas". *Pueblo v. Dolce*, 105 D.P.R. 422, 427 (1976). En palabras sencillas, habiendo el Tribunal Supremo de

los Estados Unidos reconocido expresamente la facultad de los estados federados *para expandir* la garantía contra registros y allanamientos ilegales más allá de los límites de la citada Cuarta Enmienda, *Cooper v. California*, 386 U.S. 58, 62 (1967), este Tribunal —al interpretar la Constitución del Estado Libre Asociado— *puede ampliar* el ámbito de los derechos humanos de los residentes de este País. *Pueblo v. Dolce*, ante, pág. 428.

En lo que respecta a la situación que plantea el recurso ante nuestra consideración, procede que se enfatice el hecho de que aquí no se trata del poder o discreción que tenemos para "ampliar" el ámbito de la protección concedida. *En el presente caso, llana y sencillamente, nos enfrentamos a un lenguaje expreso y específico de nuestra Constitución, el cual venimos en la obligación de acatar y poner en vigor en nuestra jurisdicción.*

## III

La citada Sec. 10 del Art. II de la Constitución del Estado Libre Asociado establece que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> No se interceptará la comunicación telefónica.
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
> *Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.* (Énfasis suplido.)

Al momento de redactarse esta disposición constitucional quedó plasmado en el Diario de Sesiones de la Convención Constituyente el interés de que nuestra Carta de Derechos no fuera una que meramente cumpliera en forma

mínima con los requisitos impuestos por la Ley 600,([2]) sino que, por el contrario, la misma constituyera una de las cartas de derechos más liberales, más generosas y más auténticamente democráticas del mundo.([3])

Dicho propósito tuvo como base la conclusión de que:

> La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano *son como una prolongación de su persona*, pues constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda intromisión sin su permiso en ese círculo privado equivale para todo hombre a una violación de su personalidad ... . *La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona.* (Énfasis suplido.)([4])

Este Tribunal, no hay duda, tiene *la obligación* —y el derecho— de *interpretar* las disposiciones de nuestra Constitución. Después de todo, "[i]nterpretamos una Constitución, no los Rollos del Mar Muerto". *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983).

Ahora bien, *a lo que este Tribunal no tiene ningún derecho* —so color de calibrar "los costos sociales positivos y negativos que la Constitución representa para una eficaz administración de la justicia" (opinión mayoritaria, págs. 359–360)—*es a ignorar, y desacatar, un específico, expreso y transparente mandato constitucional como el aquí en controversia.*

El *mandato* contenido en la citada Sec. 10 de nuestra Carta de Derechos no puede ser más claro: decretado, por tribunal competente, que una evidencia ha sido obtenida *en violación* de sus disposiciones, *dicha evidencia es inadmisible en los tribunales de nuestro País.* Como podemos notar, la citada disposición constitucional *no* establece, *ni*

---

([2]) Ley Pública Núm. 600 de 3 de julio de 1950, Cap. 446, 64 Stat. 314.

([3]) 2 Diario de Sesiones de la Convención Constituyente 1106 (1952).

([4]) Diario de Sesiones, *supra*, T. 4, pág. 2567.

contempla, diferencia alguna entre pleitos civiles o criminales *ni* exige que el Estado sea parte en el pleito en que se pretende presentar la evidencia.

*Lo verdaderamente importante y determinante lo es que la evidencia haya sido ocupada ilegalmente.* La determinación sobre ilegalidad, naturalmente, *presupone o requiere que la evidencia en controversia haya sido ocupada mediante "acción estatal"*; esto es, por un agente del orden público, *Pueblo v. Rovira Ramos*, 116 D.P.R. 945 (1986);[5] o por "un empleado gubernamental en funciones análogas a las de un policía estatal", *Pueblo v. Rosario Igartúa*, 129 D.P.R. 1055, 1077 (1992); o por una persona particular cuya conducta sea, de alguna forma atribuible al Estado. *Pueblo v. Rosario Igartúa*, ante; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

## IV

En el presente caso, como hemos visto, la evidencia en controversia fue ocupada por agentes del orden público durante el diligenciamiento de una orden de allanamiento. La ilegalidad de dicha ocupación fue decretada por tribunal competente; determinación judicial que se convirtió en final y firme al Estado acatar la misma.

Conforme la disposiciones, y el claro mandato, de la citada Sec. 10 de la Carta de Derechos de la Constitución del Estado Libre Asociado, dicha evidencia resulta ser "inadmisible en los tribunales" de justicia de nuestro País; ello independientemente del hecho que el pleito en que se pre-

---

[5] En *Pueblo v. Rovira Ramos*, 116 D.P.R. 945 (1986), seis de los Jueces que entonces integraban el Tribunal —a saber, los Jueces Asociados Señores Irizarry Yunqué, Negrón García, Rebollo López, Ortiz, Hernández Denton y Naveira de Rodón— estuvieron contestes, aun cuando en ponencias separadas, en que la protección brindada por la antes citada Sec. 10 es "una prohibición contra el Gobierno". *Íd.*, pág. 952.

tende` utilizar la misma sea uno civil o criminal y el Estado sea o no parte en el mismo.

Los forjadores de nuestra Constitución no entendieron procedente limitar la prohibición a procesos de índole penal; este Tribunal ciertamente no tiene el poder ni autoridad legal para reescribir la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, ante, a esos efectos.

El mandato constitucional en controversia no puede ser más claro, expreso y específico. Este Tribunal no está autorizado para cuestionar la "sabiduría" del mismo. Es por ello que disentimos.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

Mediante la opinión del Tribunal, una mayoría de los integrantes de este Foro resuelve que en pleitos civiles entre partes privadas no aplica la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Por ende, en una acción sobre resolución de contrato de arrendamiento y deshaucio sería admisible, como parte de la prueba del demandante, determinada evidencia testifical y documental que en un procedimiento criminal anterior había sido judicialmente suprimida por haberse obtenido en contravención a la Sec. 10 del Art. II de nuestra Constitución, *supra.*

La mayoría llega a este resultado para resolver una cuestión novel de hermenéutica respecto a la Sec. 10 del Art. II de nuestra Constitución, *supra.* Por un lado, visto literalmente, el texto de esa sección parece establecer una prohibición *absoluta* en contra de la admisión en los tribunales de evidencia procurada ilegalmente. Por otro lado, al investigar el historial de la Sec. 10, *supra*, se encuentran razones para suponer que al redactarse ésta sólo se preten-

día cristalizar el estado de derecho vigente en 1952, que, en general, establecía una norma de exclusión de evidencia para casos *penales*. Este aparente conflicto sobre cuál es el verdadero sentido de la Sec. 10, *supra*, requiere la intervención de este Tribunal, y provoca la decisión aludida antes.

La opinión de la mayoría se formula esencialmente sobre la base de dos (2) razonamientos fundamentales que requieren ponderada consideración. Veamos.

## I

Con mucha razón, señala la mayoría que la decisión sobre la exclusión o admisión de la evidencia en el presente caso nada tiene que ver con su valor probatorio o su confiabilidad. Si los testimonios y documentos en cuestión se excluyen no es porque no son pertinentes o porque no merecen crédito, sino porque otras importantes consideraciones de orden público ajenas a su valor probatorio intrínseco así lo requieren.

También tiene razón la mayoría al indicar que la aplicación invariable de la regla de exclusión ante nos tiende ominosamente a menoscabar el propósito medular de las normas relativas a la prueba, que es el descubrimiento de la verdad en todos los procedimientos judiciales. Este efecto adverso de la regla de exclusión es ciertamente muy serio, como bien se señala en la opinión de la mayoría, no sólo porque puede producir resultados injustos que lesionan los derechos de las partes y provocan que se pierda confianza en el sistema judicial sino, además, porque atenta contra la integridad misma del proceso de adjudicación cuya legitimidad descansa precisamente en que está destinado al descubrimiento de la verdad.

Como en el Derecho hay pocos fines de mayor jerarquía que la búsqueda de la verdad en los procedimientos judiciales, concurro con la posición intimada por la mayoría de

que, no obstante su origen en nuestra Constitución, esta regla de exclusión no puede aplicarse de modo automático o invariable en todos los casos, y que es necesario establecer un balance entre los propósitos de la regla de exclusión y los "costos sociales ... negativos que la Constitución representa para una eficaz administración de la justicia". Opinión mayoritaria, págs. 359–360. Este primer razonamiento de la opinión mayoritaria nos parece correcto.

## II

Es el segundo razonamiento el que presenta mayores dificultades.

Según la opinión de la mayoría, la Sec. 10 del Art. II de nuestra Constitución, *supra,* tiene tres (3) propósitos. El más importante es desalentar a los funcionarios del orden público de conseguir evidencia incriminatoria ilegalmente; también se persigue evitar que los tribunales sean "cómplices de actos de desobediencia a la Constitución", y "tercero, impedir que el Gobierno se beneficie de sus propios actos ilícitos". En consecuencia de lo anterior, según la mayoría, si el Gobierno no es parte en un caso, si no se beneficia con la admisión de la evidencia ilegalmente obtenida, o si no hay común acuerdo con un agente del orden público, entonces no aplica la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra,* y se puede admitir en los tribunales la evidencia controvertida.

El problema principal que presenta este razonamiento es que no acoge propiamente el propósito más fundamental de la aludida disposición constitucional. Esa disposición es parte integral de una visión que permea toda nuestra Carta de Derechos. Los derechos fundamentales reconocidos y protegidos en el Art. II de nuestra Constitución, *supra,* responden todos al principio de que la dignidad del ser humano es inviolable. Todo el entramado normativo de la Carta de Derechos va dirigido a dar plena realización a

este fundamental concepto. 4 Diario de Sesiones de la Convención Constituyente 2561 (1952). La razón más contundente por la cual se prohíbe el uso en los tribunales de evidencia incriminatoria contra una persona, si aquella es obtenida ilegalmente, es porque ello constituye un ataque grave a la dignidad del ser humano. En el propio Informe de la Comisión de Carta de Derechos se explica esta visión con meridiana claridad, precisamente al comentarse la Sec. 10 del Art. II del Estado Libre Asociado, *supra*:

> La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano *son como una prolongación de su persona*, pues constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda intromisión sin su permiso en ese círculo privado equivale para todo hombre a una violación de su personalidad ... . *La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona.* (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 2567.

Es porque se estima que la obtención ilegal de evidencia vulnera la preciada intimidad de la persona que el lenguaje de la Sec. 10 de nuestra Constitución, *supra*, tiene un tenor tan absoluto. La prohibición a la admisión judicial de la evidencia procurada ilegalmente se expresó en términos tajantes precisamente para manifestar de modo palmario que ello es totalmente incompatible con la visión de la dignidad del ser humano que la Constitución consagra.

### III

A la luz de esta innegable realidad de nuestro ordenamiento jurídico, al aplicar la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra*, no cabe distinguir entre casos civiles y casos penales. Si se ha vulnerado la intimidad de la persona para obtener determinada pieza de evidencia, ésta no es admisible en ningún proceso judicial, sea de la naturaleza que sea. Más aún, en virtud del interés primordial que se quiere proteger, son *pocas* las

excepciones que pueden hacerse a la regla de exclusión que nuestra Constitución directamente decreta. Aun frente al interés preeminente del descubrimiento de la verdad en los procesos judiciales, prevalece la protección de la inviolabilidad de la persona.([1]) Las pocas excepciones concebibles al mandato de la Sec. 10, *supra*, las sugiere el propio historial constitucional de esa sección. Serían aquellas donde no hay propiamente una intromisión irrazonable del ámbito protegido. Sin pretender pautar aquí una norma definitiva, se nos ocurre que puede haber algunas raras ocasiones donde el interés en el descubrimiento de la verdad sea más importante que alguna intromisión de menor cuantía o meramente técnica, o donde la intromisión sea respecto a algún lugar o efecto que pueda considerarse escasamente como una prolongación de la persona. En tales ocasiones, sería propio realizar el balance de intereses que propone la mayoría según el razonamiento discutido al principio de esta opinión.

El presente caso podría presentar una situación en la que concebiblemente cabría aplicar el aludido razonamiento de la mayoría. La evidencia en cuestión fue obtenida durante un allanamiento efectuado *mediante una orden judicial.* Y el lugar registrado era un *local comercial* aparentemente dedicado al baile y al consumo de bebidas alcohólicas. Es enteramente posible que en estas circunstancias no haya ocurrido aquí una intromisión inaceptable de la intimidad del demandado que justifique menoscabar el descubrimiento de la verdad, aun en un procedimiento civil, separado y distinto del proceso original penal para el cual se procuró la prueba. Si esto hubiese sido lo resuelto por la mayoría, hubiéramos podido concurrir con el

---

([1]) En nuestro ordenamiento jurídico no existen valores superiores a los derechos humanos. Como bien señala el Preámbulo de nuestra Constitución, "Nosotros, el pueblo de Puerto Rico ... declaramos ... que entendemos por sistema democrático aquel ... donde el orden político está subordinado a los derechos del hombre ...". *Preámbulo*, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

resultado. La opinión mayoritaria, sin embargo, expone criterios muy generalizados y abarcadores, y el resultado al que llega así concebido no es aceptable, por lo cual debemos disentir.